May it please the Court, my name is Kevin Brodar and I represent the Smart Transportation Union in the matter before the Court. Before we get started, I would like to reserve six minutes of my time. Alright, please watch your time. That's your total time that you have. Thank you. Alright. Before getting to the merits of the case, I did want to address the standard that was raised. I think it's fairly clear from the cases that both parties have cited here that the granting of an injunction would be reviewed under abuse of discretion, although there's been no granting of an injunction here. But the underlying legal conclusions to get there are reviewed de novo. So the determination of major minor status quo, all the cases are very consistent in that, and that's reviewed de novo. The denial though of a preliminary injunction is overall subject to limited review. Correct. Okay. With regard to the merits, despite BNSF's attempt to take the Court through a long road of railroad arcana, this is a fairly straightforward case with a fairly straightforward application of some very clear principles under the Railway Labor Act. This is somewhat Wizard of Oz-like that the BN has downplayed that and doesn't want you to pay any attention to that Section 6 notice that they filed. Well, to me, the Section 6 notice is less important than the because if a Section 6 notice, and correct me if I'm misunderstanding the procedure, but if a Section 6 notice is given for a minor dispute, that doesn't necessarily have the same effect as if it's given for a major dispute, right? Well, there wouldn't be a Section 6 notice given for a minor dispute. Oh, so you're saying the giving of a Section 6 notice in and of itself flags the dispute as a major dispute. Correct. And that's essentially what the Court held in Detroit-Toledo Shoreline, Chicago-Northwestern, and then the Conrail case, Conrail v. Orlea. But it's not strict liability. I mean, the Court, just because a Section 6 was filed, that doesn't end the Court's inquiry, does it? No. I mean, Section 6 does not equal major for the purposes of this analysis. I mean, it's relevant, but did the Court still have to do the major-minor analysis? The Court would look to see if the actual, yeah, whatever was actually filed, that was a major dispute. And you would look at the underlying facts. Is this really a major dispute? I thought you said the filing of a Section 6 notice in and of itself denominates the action as a major dispute in the story. Okay. I get what you're saying. The filing of the Section 6 notice in the general course starts the major dispute process. In this case, the carrier is saying, well, that's really not the end of the story because this really isn't a major dispute. So the dispute is, is this a major dispute or not a major dispute? Right. Our contention is, the filing of that Section 6 notice, there's no dispute that the filing of that Section 6 notice began the major dispute process in national handling. Only if it's a major dispute. That's the difficulty I'm having. It seems like it's a tautology. You're saying because they filed a Section 6, it's major, and it's major because they filed a Section 6. So we never get to the major dispute. Don't we have to get there? Okay. Let's back up a bit. Well, just to kind of go on that, my understanding is that here, the work schedules are interdivisional, that what the Section 6 was, was going to be a broader change. And here they made what three interdivisional ones that the court looked at and said, they're minor. Correct. That's what the lower court found. All right. But the Section 6 was proposing for everything, right? Yes. Correct. So the three interdivisional ones are a subset of the big Section 6, right? Correct. Okay. Okay. Can I back up to that? Yes. Okay. In order to change an agreement, you have to file a Section 6. That's the way the act is structured. BN wanted to change the agreement. The background, the backstory with regard to employee availability has always been an issue. The carrier would like to have people available a lot more, and the employees don't necessarily want to work all the time. So this has been a major issue. The carrier in the recent round of national negotiations started with the March or the November 2014 Section 6 notice. That's what starts that round. They wanted to change the employee availability policies, the employee availability rules. Okay. So they served the Section 6 notice to start that process. That Section 6 notice contains in it the specific request to change, to implement predictive work schedules and various other issues with regard to employee availability. But everywhere? Everywhere. And that's everywhere. If you wanted to carve out what was in Article 9, you could have done that, but they didn't. This was the broad conceived. This isn't narrow. This is broadly conceived. Okay. But now just so that we contextually have everything that's... All right. You were seeking a stay so that they couldn't implement these three interdivisional ones, correct? Correct. But this is all going to go to arbitration anyway. And so at the time of arbitration, because there's not a stay, then we're going to have three interdivisional ones that maybe the employees like, right? That maybe, you know... Well, they would go to arbitration if the district court decision was to... See, that's what they're going to say. That's what they're going to say. And then what you're going to say is they didn't get permission to... They didn't get... I don't know. There's some other case where they lost, so they didn't get permission. And then so they cut this little chunk out, and so they're trying this little chunk out to see how that goes. So you're saying they're going through the back door, what they couldn't do through the front door. Correct. And this is no different than the cases that we've cited in Wheeling and Lake Erie or Winona Bridge. So what error of law did the district court make? Because if the district court... If we're reviewing the district court for abuse of discretion, if the district court got any of the law wrong, you obviously have a better argument. Right. And I think that's where the district court went wrong is that it found that it was a minor dispute. The district court just ignores the Section 6 notice. Essentially, the district court has said the Section 6 notice means nothing. So what's your best case as a matter of law that the district court was wrong? The act itself. You can't ignore what the Section 6 notice is. According to the district court, the service of the Section 6 notice means absolutely nothing. The carrier can do what they want. That's not how the count... The act was structured through Section 2 First, through 2 Seventh, and through Section 6 to make sure that there were no changes made to agreements without going through this process. That Section 6 has meaning. It's not just something that you do pro forma. It has meaning under the act. So the district court thought that there really was not... I read the district court order as concluding that there really was not a proposed change to the agreement. Rather, there were operational changes that were within the agreement. Is that fair? Do you think the district court... Is that a fair reading of the district court order? No, I read it a little bit differently. I thought on ER 6, it says, Smart TD 6 in order to compel BNSF to maintain the status quo. BNSF argues that the establishment of the service with these operational changes is permitted under the existing collective bargaining agreement. That's what it says on page 6. Correct. That is BN's argument. Right, but the district court agreed with that. That's why we're here. But that's what I'm saying. Why is that an error of law? That the district court agreed that this is not really conceptualizing a change in the bargaining agreement, just implementing some of the provisions of the agreement. Why is that an error of law that requires us to reverse the denial of the preliminary injunction request? Because once you serve that section 6 notice, it's status quo. You can't change it after that. But you say there's no case for that other than just looking at the statute, right? No. The closest case of all the cases that you've been cited, the closest case is the Butte-Anaconda case, where the carrier served the section 6 on trying to reduce crew size. Union would not agree, so the carrier just implements. And the court found you can't do that. That section 6, the status quo, has to stay that way until you exhaust the process. I see my time is up. I have a question or two, and if it extends your time, I know my colleague will give you some extra time for rebuttal. In what way is the district court's determination that this was a minor dispute inconsistent with the Conrail decision? Inconsistent with the Conrail decision? Isn't that the Supreme Court case that defines? Right. And it lays out the major and minor dispute test. Tell me in what way the district court's, Judge Lassnick's, determination was inconsistent with the requirements of Conrail? It's inconsistent, and it kind of goes back to this really is not so much a major minor case as a status quo case. And I accept that if it's determined to be minor, it goes through arbitration under the CBA. Correct. If it's major, it goes through the procedures of section 6 of the RLA, which would include a stoppage of the proposed change pending the resolution. Correct. And the carrier has made it a major dispute by serving it in its national handling section 6. If you're saying... As opposed to simply sending the union a letter saying we've got a dispute under the CBA? Right. If the carrier never sent its section 6, or let's say it served the section 6 of the RLA, we wouldn't be here. But they did. So once you serve that section 6 notice, according to all the cases that talk about major disputes, you can't go changing that until the process has been completely exhausted. But all those cases actually involve major disputes. That's the difficulty I'm having with your argument. Do you have a case where a section 6 notice was held to overrule the subsequent determination that the dispute was a minor one? That's kind of what we have here. Right. And when you look at the case of Will and Elia Carey, the Butte-Ottacona case, the carriers all there argued that they were minor disputes. We're not changing anything. We're just going through. Section 6 notice? The carrier served the section 6 notice in all those cases. The carrier served the section 6 notice, not the unions. The cases that the carrier cites here, BN cites, saying that they're minor disputes is where the union served the section 6 notice. And the courts say, well, you can't make a minor dispute into a major dispute just by the serving of the section 6 notice. But that's not the fact pattern here. Could the arbitration result in a determination that BNSF was at fault in implementing these changes? Could the arbitration . . . Just hypothetically assume that we were to affirm the district court, which means you go back and you go through CBA arbitration. Could that procedure result in a determination favorable to your client? Favorable. Well, what happens in the Article 9 proceeding is the carrier presents a notice. And the notice has all the detail to it. We disagree with the detail. You go to arbitration. The arbitrator says, well, that's agreeable. That's reasonable. The standard is what's reasonable. Let me explain why I'm asking. This is a little different context for us. Normally, when we deal with a preliminary injunction denial, one question we always ask ourselves is, can the party that's claiming to be aggrieved by the denial recoup their position on a proceeding on the merits? And ordinarily, if the answer to that is yes, we'll uphold the denial of a preliminary injunction. If that doesn't fit in this context, tell me why. It does not fit in this context because the carrier's position is essentially going to be the one that's upheld. And the arbitrator may make changes to it. I'm sorry. Why is that true that the carrier's position will be upheld in arbitration? Are you saying that in the arbitration, the carrier is inevitably the winner? In Article 9 cases, most of the time. Really? Well, it's pretty hard. That's a pretty bold statement. Without looking at it, I'm thinking they're going to, they think they lose. They lost something, you know, over implementing the whole thing without going through another process. So, I don't know. That seems really, I guess everyone remembers their losses very vividly.  All right, counsel, we'll give you some time for rebuttal. You have to use your time. Thank you. Good morning. I'm David Pryor here on behalf of BNSF Railway. Do you always win? In fact, I remember an argument in front of this court two years ago where I resoundedly 3-0, I did not win. So, Judge Reinhart wrote the opinion. But he's saying in arbitration. Oh, no we don't, Your Honor. And to Judge Hawkins' point, the dispute here is whether term removal and predictive work schedules are reasonable in practical terms as imposed by Article 9. So, could an arbitrator say they're not? Yes, an arbitrator could. What would be the result of that? Well, suppose an arbitrator said, look, multidirectional service is reasonable. But term removal and predictive work schedule is not. We would then have multidirectional service, larger pools handling many directions. But we would have to use a different type of pool rotation than term removal. And we couldn't use assigned service, which is predictive work schedule. We'd have to be unassigned service. We'd have to basically go back to whatever the pool rotation circumstances were prior to filing the Article 9 notice. And we would have to go back to the unassigned service, which was basically the type of trained service before we suggested predictive work schedule. Why did you serve Section 6 notice in this case? Well, we didn't. We serve Section 6 notices every five years. So, in national bargaining, we have basically five-year agreements. They don't expire at the end of five years. But the moratorium clause, which prevents the one party from forcing the other party to bargain over these issues, expires. So, we serve Section 6 notices to reopen those issues. If we didn't do that, we would take a first step towards a major dispute that is we would release the union from the obligations of the agreement. It could potentially strike. So, every – well, just before the expiration of the agreement, all the carriers band together in multi-employer bargaining. We serve Section 6 notices over very high-level issues. And then the union does the same thing, and we start national bargaining. So, what was the temporal comparison between the time you served the Section 6 notice and the time you implemented the challenged provision? Well, my recollection is we served Section 6 notices in November of 2014. And we implemented these Section 6 notices in – excuse me, these ID notices in 2015. Is that a fraud? I don't know. With respect to – In February, you said? No, I think these were in the spring, in the spring of 2015. And I think you've kind of hit upon sort of the chicken and the egg here. There are seven circuits which have held the bargaining process does not implicate or affect existing rights in any way. We cite them on pages 20 through 22 of our brief. The 2nd, 3rd, 4th, 6th, 7th, and 8th circuits all squarely hold that Section 6 notices don't have any effect on existing rights for the major-minor analysis. And the 9th circuit has held the bargaining process. It's not – the Mesa Air Group case is directly on point. The only little twist in Mesa Air Group is it's not clear, 100% clear from Mesa Air Group that the bargaining that the airline wanted to do was subject to Section 6 notice. Mesa Air Group was a case where, for 11 years, the airline had used the pilot hours of service rules to do hours of service for flight attendants. The contract expired. About three months later, the airline said we would like to have – they wanted to bargain over the issue, the issue of which rules would apply to the flight attendants. Would it be the pilot hours of service rules or the FAA's flight attendant hours of service rules? After that, after the bargaining hadn't gone anywhere, the airline unilaterally imposed the pilot rules – excuse me, the flight attendant rules. The union said, well, wait a minute. You've got an 11-year practice of using the pilot rules. You can't do that. And the 9th circuit squarely rejected any implication of the bargaining process over the existing right. What the 9th circuit said was, look, the airline has an arguable basis for its position. The contract doesn't foreclose them from using the flight attendant's hours of service rules on the flight attendants immediately. And there's a manager reservation of rights clause. So that gives the airline the flexibility to do it. At least it plausibly gives them the flexibility to do it. And therefore, they can do it. And what's interesting about that case is – But then it's still arbitrated after in the final sentence. Of course. Yes. And then on page – see, it looks 1049. The Shoreline case was – argument was made almost exactly the same way the union makes it here. And what the court said was, AFA's interpretation of Shoreline would eliminate any distinction between major and minor disputes in cases where the union contends that management's action violates established practice, including cases where the CBA arguably or even clearly allows management to change the status quo. So I think the 9th circuit is squarely with the other circuits like the 3rd and the 4th, which is a view of terms like mooted or inapplicable. They've said once you determine that there's an existing right, once you've determined that it's plausible or non-frivolous, an existing right exists, the status quo analysis is mooted or inapplicable. Well, let me ask you this. Is the reason – and you're probably not going to really want to tell me – but the reason that you do this is then maybe at the arbitration some of the employees like it? Yes, sometimes. I'll give you a perfect example. We did one up here. It's directional services. And then they don't like it because they may think that a different position is better overall. But then they have employees that like it, so there's dissension within the ranks. Sometimes, yes. Is this a little bit divide and conquer? Well, I don't know so much of that, but there are – I mean, we want the efficiencies. I mean, the example I was thinking of here is the triangle service we have where we wanted to run trains directionally. Rather than running them, you know, stopping a train and then siding it and going, we wanted to run all of our trains in one direction around a triangle here in the Pacific Northwest. Some employees would have liked that service because they get more predictable rest time. Other employees, they might like the way their life is, right? The reason we did it is because it made it more efficient. We're running everyone the same way. We have to side fewer trains so we can move more throughput. Same thing here. When we have multidirectional service, we have a bigger pool of employees to call from for the trains, so we're less likely to get to the end of our pool because we have a bigger pool doing multidirectional service. Why do we care about that? Because when we get to the end of the pool, we have to call somebody off the extra board. And extra board employees are more expensive than the employees on the unregulated side. So an employee would get paid better so they would like it. That would be a reason they would like it the other way. They could make more money. Someone who was on the extra board might dislike these ID notices. Yes. Somebody who's in regular pool rotation, somebody who might actually be affected day-to-day by term removal and predictive work schedule might like it better because that employee may go to work at a regular time. But we're less likely to call somebody off the extra board at a premium. So yes, there's somebody who's out there on the extra board. That's their job. Their job is not to come to work every day when their train gets called. Their job is only to come to work when the regular pool rotation has been exhausted. With respect to the cases that Mr. Oh, go ahead. You're like a relief pitcher. Yes, you're like a relief pitcher and sometimes you pay more per inning for a relief pitcher. With respect to the cases the union cites, I would suggest that none of those cases are on point. The Chicago and Northwestern case, they cite it on page 11 of their brief. Excuse me, their reply brief. If you take a look at the quoted section of Chicago and Northwestern on page 11 of their reply brief, take a look at the section that's not underlined. It says, if the railroad, and here's the key, acknowledging that the collective bargaining agreement forbade it to sell a line without protecting the affected employees had filed a section 6 notice demanding a modification of the agreement to free its hand. So if the railroad conceded it didn't have the existing right and served the section 6 notice to free its hand, now you have a case like Winona Bridge, which is one of the ones they cite. Here, though, nobody even really contends disputes that we have the existing right. That is, if it wasn't for the section 6 notice, this would be a reasonable application of the CBA. And so that's why Chicago and Northwestern doesn't apply because we have the existing right. The same is true for each of the other cases they cite. Wheeling, in Wheeling on page 693, the court used a major minor analysis and said that the railroad's position was frivolous under the CBA. So your argument basically is that you're justified under Article 9 of the existing collective bargaining unit to make this so the court should make the major minor analysis and that Conrail that was discussed previously that you've got an arguably justified position that is not frivolous. Yes, Your Honor. But now you also want us to consider for the first time an appeal that the appellant failed to present sufficient evidence to support an injunction under the Norris LaGuardia Act? Yes, Your Honor. Why should we do that? Well, for two reasons, Your Honor. Number one, under Norris LaGuardia, Section 1 and Section 7, the Act itself says that it's jurisdictional. That a district court lacks jurisdiction to issue an injunction in a labor matter unless the requirements are met. So I don't think there's a possibility to waive it. It's jurisdictional. That's what the 9th Circuit did in Mesa Airlines, right? In Mesa Airlines? Yeah. They sent it back and said dismissed for lack of jurisdiction. Yeah, but it was dismissed for lack of jurisdiction because it was a minor dispute. Right. Yeah, but here I think what we're saying is that even if you had a major dispute but failed to meet the standards of Norris LaGuardia, you could still lack jurisdiction because of the nature of a labor dispute. That's an alternative. Yes. It is, Your Honor. If we determine that it's a minor dispute, then the district court had no subject matter jurisdiction and neither do we. Yes, and you would be done. Here we basically have two tracks. We say, look, they're wrong on the legal standard. The legal standard is start with Conrail. And once you figure out that you've got a Conrail situation and you meet the standard for minor dispute, the Section 6 issue is mooted and inapplicable. But if you were to accept their legal standard and say that the Section 6 notice actually somehow could cabin or circumscribe or even erode existing CBA rights, we don't think they have the right type of evidence to get an injunction here. One, because of Norris LaGuardia. And two, because even if Norris LaGuardia didn't apply, they didn't put any evidence in front of the court other than the Section 6 notice. The complaint is not verified. There were no declarations filed. And so even their own theory that somehow the Section 6 bargaining that's happening in D.C. is the exact same type of issue that we are talking about in an ID notice, that's speculation. There's nothing to tie it together except for the allegations in the complaint. And the complaint's not a verified complaint. One other point I'd like to make. He also made the point that Butte, which is a Ninth Circuit case, was on point. I would point you to page 59 of Butte, where the court says that the railroad concedes there's no question on interpretation of existing agreements. So again, it's like the Northwestern case. In that case, the railroad wasn't able to come forward and say, hey, here's my agreement. Here's my existing right that I want to immediately. Is there anything that needs to be published on this? Do I think this is a controversial case that would... No, I mean, is there something because you said the Ninth Circuit basically is in sync with the other circuits, but not but not quite. Well, I would say that the only thing that would be beneficial is a full recitation that Section 6 notices don't matter. Look, if you look at the case of Airlines Group, I think it is circumstantially almost a slam dunk that that was a Section 6 process underway because of the expiration of the contract. They said that now they've talked about proposals and the rejection, but it doesn't actually say it. It just says they were in bargaining over the issue about hours of service for flight attendants. So if this court were to say, look, this actual technical service of a Section 6 notice does not affect existing rights... Is there any circuit that goes the other way? No. That says that the serving of a Section 6 notice somehow cabins an existing right? Into a major dispute. No. I'm only aware... I mean, I say I know there are seven circuits that go the other way and I'm aware of none that go the way the Union would like. If there's nothing else, I'll sit down. Thank you, Counselor. Let's have two minutes for rebuttal. With regard to the case law and MESA, in MESA it's unclear as to what was actually being put forth in the Section 6 notices and whether the issue of what the correct FARs were, were part of that bargaining. That, again, is not the fact situation here. The fact situation here is they, the carrier, put at issue in its Section 6 the very changes they want to make right now. Are there any circuits that say that a Section 6 notice equals major? Yeah. Oh, absolutely. The Detroit-Toledo-Shoreline talks about the Section 6 starting that. The CNNW case, which we quote in the reply brief, talks about that that kicks off the major dispute process. That's how you start a major dispute process. That's how you change an agreement through Section 6. If you don't have a Section 6, the agreement doesn't get changed. Well, I know that that's how you start it, but is there any circuit that held that by virtue of filing Section 6 that a court doesn't go through the major-minor analysis? Because if the Ninth Circuit said that, then we wouldn't be asking all these questions. I understand. Um... And I can only point you back to the statute itself. And Detroit-Toledo-Shoreline and even Conrail talks about this, is that when you serve a Section 6 notice under the Act, you're trying to change the agreement. That is the major dispute process. So that's what you would like this court to hold? Yes. In this situation. How long is a Section 6 notice effective? Until it's resolved. And it can go on for years. So that's the thing that is a little bit troubling, so that any action once a Section 6 notice is filed, any action that the employer seeks to take following that Section 6 notice is automatically a major dispute, regardless of whether or not there's an arguable basis for the action under the contract. No, that's not what I'm saying. But you can file a Section 6 notice, too, though. We can. So then you could make every dispute major. We could, if we held what you're asking us to hold. Well, I've got to think these things through. Be careful what you ask. Well, you would like that. I would like that. I don't think they're going to give me that. That can't be right, that the filing of a Section 6 notice until it's resolved and any action that sought to be taken by the employer automatically becomes a major dispute simply because there's an overarching Section 6 notice out there. The Section 6 notice is not just some big old notice. It actually has detail to it. Under the Railway Labor Act, agreements don't expire. They just get amended. So when the moratorium is up, you're going to serve a Section 6 notice on Issue 1, 2, and 3. There may be 40 issues out there, but you only want to talk about 1, 2, and 3. With regard to 1, 2, and 3, you've now started the major process on that. The 37 other issues are going to be what they're going to be. The issue still is whether under the existing agreement, even though there's a Section 6 notice out there, could the employer under the bargaining agreement arguably take the action that it wants to take despite the pendency of the Section 6 notice? Not where you've detailed exactly what you want to talk about in the Section 6. But that's for the district court to decide whether or not the Section 6 notice that was given encompasses the action that the employer is inclined or has proposed or whether under the existing agreement,   that it wants to take despite the Section 6 notice? I think that's where we are. Do you all agree? Obviously. Any closing remarks, counsel? Just quickly on the Norris-LaGuardia thing. We did not move under Norris-LaGuardia. That's not part of this case. We moved under the Railway Labor Act. Whatever that argument is really isn't even applicable. Thank you.
judges: Hawkins, Rawlinson, Callahan